**Opinion issued February 13, 2020**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-19-00005-CV

————————————

**AUTUMN BISCAMP, Appellant**

**V.**

**SPECIAL PALS, INC., Appellee**

On Appeal from the 133rd District Court
Harris County, Texas
Trial Court Case No. 2017-37057

## MEMORANDUM OPINION

While performing community service at an animal shelter, Special Pals, Inc. ("Pals"), appellant, Autumn Biscamp, was bitten by a dog and injured. Biscamp sued Pals for negligence, and Pals asserted an affirmative defense of release. A jury found both Pals and Biscamp negligent and awarded Biscamp damages. Pals moved

for judgment on its affirmative defense, which the trial court granted and rendered a take-nothing judgment against Biscamp. In her sole issue, Biscamp contends that the trial court erred in rendering judgment against her because the pre-injury releases she signed do not comport with the express negligence doctrine and thus are unenforceable as a matter of law.

We affirm.

## Background

Pals is a limited-intake, no-kill animal shelter that rescues dogs and cats and provides them with temporary shelter and medical care until adopted into permanent homes. Pals is a non-profit organization that operates on private donations. Pals is a member of the Harris County Community Supervision and Correctional Department ("HCCSCD") Community Service Restitution Program ("Program"). As a member of the Program, Pals is an approved location for the HCCSCD to assign individuals to perform court-ordered community service hours.

After a trial court ordered Biscamp to complete community service hours through the Program, she selected Pals. On May 31, 2015, as a condition of her service, Biscamp signed certain documents, including a Community Service Agreement ("Agreement") and a Tetanus Vaccination Waiver ("Waiver").

The two-page Agreement includes the following release:

I understand that although [Pals] will make every attempt to ensure the safety of their volunteers and animals, rescue animals are by nature

2

unpredictable in their behavior. Therefore, I assume the risks of being bitten, scratched, injured, or frightened by cats, kittens, dogs, and puppies in connection with my volunteer work for [Pals]. Neither [Pals] or any of its Directors, volunteers, fosters, or other affiliates are liable to me for any injuries, damages, liabilities, losses, judgments, costs, damage to property or expenses whatsoever that I might suffer or sustain in connection with the performance of my volunteer activities for [Pals]. I will indemnify, defend, and hold the [Pals] Board of Directors, volunteers, fosters, or other affiliates harmless from and against any claims, lawsuits, injuries, damages, losses, costs, or expenses whatsoever sustained by any foster animal or any person in connection with my intentional misconduct or grossly negligent performance of volunteer activities for [Pals] or my breach of [Pals's] rules, regulations, policies, and programs.

The one-page Waiver includes the following release:

I agree that on behalf of myself, my heirs, personal representatives and executors, I release, discharge indemnify, and hold harmless [Pals], its agents, employees, directors and board of directors from any and all claims, causes of action, or demands of any nature of cause, including costs and attorney's fees incurred by [Pals] in connection with the same, based on damages, or injuries which may be incurred or sustained by me in any way connected with my services for [Pals], including but not limited to animal bites, accidents or injuries.

During Biscamp's first day of service, June 3, 2015, a dog bit her leg, as discussed below. Biscamp sued Pals for negligence, alleging that Pals failed to provide a safe environment, adequate equipment, safe cages with "properly locking latches," and adequate training and supervision. She further alleged that the dog at issue had "dangerous propensities," of which Pals failed to warn her. Biscamp sought past and future medical care and expenses; past pain, suffering, and mental anguish; future pain and suffering; past and future physical impairment and

3

disfigurement; lost earnings; loss of earning capacity; "fear of future disease or condition"; and "cost of medical monitoring and prevention in the future."

In its answer, as amended, Pals generally denied the allegations and asserted, among its affirmative defenses, that Biscamp's claims were "barred by the defense of waiver, release, quasi-estoppel, and assumption of the risk." Pals asserted that Biscamp "had knowledge of the facts basic to the exercise of her rights and intentionally and unequivocally released, discharged and waived those rights by agreement." Further, her alleged damages were caused, in whole or in part, by her own negligence, and she assumed the risk inherent in the work and failed to mitigate her alleged damages.

At trial, Biscamp testified that, on May 31, 2015, she attended an orientation session at Pals and signed the Agreement and Waiver. The trial court admitted the Agreement and Waiver into evidence. After reading aloud to the jury the release paragraphs contained in the Agreement and Waiver, stated above, Biscamp testified that she understood them.

On Biscamp's first day of service, June 3, 2015, one of her assigned duties was to clean cages, which involved moving dogs housed in inside cages to one of twelve outside cages. A Pals staff member, "John," explained to her that some of the outside cages were "good" and some were "bad." Biscamp testified that a "good cage" was one that, when "the door was closed," the door and cage "[met] at the

4

bottom." A "bad cage" was one that, when the door was closed, "it wasn't all the way closed" at the bottom. Accordingly, John instructed her not to put small dogs in "bad cages."

Biscamp testified that, after moving five dogs, she moved "Moses," a black Labrador Retriever, who was "about 55 pounds," to "cage number 5." Then, while moving a yellow Labrador Retriever ("yellow Lab") to an outside kennel, she passed by Moses. While she and the yellow Lab were "5 or 10 feet away," Moses started growling. She noted that the two dogs were the same size. Biscamp testified that she tried to move the yellow Lab, but, "once [she] looked down," "Moses was just right there on [her] knee," and he bit her on her right knee.

Biscamp noted that shelter personnel placed a bandage on her knee and that she completed a Pals incident report. In the report, which the trial court admitted into evidence, Biscamp handwrote the details of the incident as follows: "Walking the dogs out and Moses got out of his cage along with another[.] [Tried] to hold one back but my leg was in the way therefore he bit my leg[.]" Biscamp signed underneath her notes and again under a pre-printed statement: "*NO MEDICAL ATTENTION WAS DESIRED AND/OR REQUIRED."

Biscamp continued working and did not go to a doctor. Later that day, she became sore and went to two urgent care clinics. She stated that they "didn't do

5

anything," however, and she went home. She later went to a third medical provider, who cleaned her knee and gave her antibiotics and pain medication.

On June 5, 2015, Biscamp's leg was swollen and painful, and she was having difficulty walking. She testified that she went to a hospital, where she was diagnosed with "flesh-eating bacteria" and underwent surgery. She noted that, afterwards, she could not walk for two weeks. Although she was "supposed to do physical therapy," she only "went once." With respect to her future damages, Biscamp testified:

Q. Are you done treating today?[1]

A. Yeah.

Q. Do you remember the last time you went to a medical doctor, what date that was?

A. Three years ago.

. . . .

Q. And how are you feeling now?

A. I still have problems.

Q. Can you tell me what those are?

A. I can't sit Indian style. I can't drive for very long. I can't sit on my knee. If I stand for long hours—which I do a lot—my leg just hurts. And I do have back pain still.

Q. Do you require additional medical treatment?

A. I'm supposed to, yes.

Q. When you say you were supposed to, what happened to that?

A. After the first surgery, I was supposed to have a second surgery.

. . . .

Q. So what were you supposed to have done?

---

1    Trial began on July 19, 2018.

6

A.   I was supposed to have the rest of the infection removed.

Q.   And what would that consist of, from your understanding?

A.   Flesh-eating bacteria.

Q.   What were you supposed to have done?

A.   They were just supposed to reopen the scar and take everything that was still there out.

Biscamp testified that she incurred $53,000.00 in medical bills. The trial court admitted into evidence her medical records and billing. The medical records reflect that she was diagnosed with necrotizing fasciitis in her knee, underwent debridement and drainage, was treated with antibiotics, and was released on June 9, 2015.

Biscamp explained that she has owned dogs, is familiar with handling them, knows that dogs can be dangerous and unpredictable, and that it was "common sense" not to "go near" a dog fight. She placed Moses in cage number 5, which was one of the "good cages," because it was a bigger cage and "seemed like it was more secure." Biscamp emphasized, "There was absolutely nothing wrong with that cage because it met all the way to the end to the top." Rather, "[t]here was nothing to hold the latch." She noted that, right after the bite, she looked at cage number 5, and "it seem[ed] like the latch was all the way up."

Douglas Worthy, an independent animal control officer, performed an inspection of the Pals facility and kennels. He testified that "all of the kennels were in good condition," the kennel at issue was adequate for the type of dog at issue, and "there were no defects in the door latches." Each of the outside kennels had a "U

7

fork latch and a carabiner," including the kennel into which Biscamp placed Moses. He opined that there was "nothing more that can be done to secure the doors" and that it was "possible that Biscamp forgot to put it [the carabiner] on."

Elizabeth Trick, executive director of Pals, testified that all volunteers at Pals participate in an orientation. During orientation, a Pals representative gives each of the volunteers a copy of the Agreement and Waiver, and the representative sits down with the volunteers, reads each line aloud, and solicits questions. Volunteers are instructed during orientation, and reminded during shifts, that if they ever feel uncomfortable while handling a dog, to simply drop the leash, walk away, and seek help from shelter staff. Pals assigns color-coded tags (red, yellow, or green) to the dogs based on their weight, which correlates to ease of handling. Any dog over 40 pounds receives a red tag. Trick testified that Biscamp represented to Pals that she had owned large dogs and felt comfortable handling them.

Trick testified generally that, on June 3, 2015, a shelter employee, John, was managing the "adoption section," to which Biscamp was assigned. Biscamp was directed to move dogs from one area of the shelter to another. Biscamp moved Moses to a new kennel. Then, as she was leading another dog past him, Moses began growling. Biscamp tried to pull the other dog away, but the situation escalated. Moses came out of his kennel, and a dog fight ensued. Biscamp attempted to intervene by pushing her leg between the dogs and was bitten.

8

Trick testified that Pals's policy is that whenever a handler puts a dog in a kennel, or cage,[2] the handler is to "close the latch and clip it." Although Biscamp stated that she did not see it, "[t]he clip is on the cage," and "[t]hey are on every cage with every door." Trick noted that the staff checks the kennels daily. She and the staff inspected the kennel into which Biscamp placed Moses. Trick noted that the kennel has a latch and a hook securing the door, it was in working order, and "there was nothing wrong with it."

Trick noted that Pals is an adoption center and does not accept aggressive dogs. Moses transferred to Pals from a Harris County shelter approximately three weeks before the incident. And, there was "no indication that he was aggressive."

The jury found that Biscamp's injuries were proximately caused by the negligence of both Pals and Biscamp, and it apportioned 70 percent of the liability to Pals and 30 percent to Biscamp. The jury awarded Biscamp damages for past medical expenses in the amount of $54,000.00; past pain and suffering of $10,000.00; past physical impairment of $5,000.00; future medical expenses of $75,000.00; future pain and suffering of $20,000.00; future physical impairment of $25,000.00; past disfigurement of $10,000.00; and future disfigurement of $5,000.00. In questions 3, 4, and 5 of the charge, the jury also found that Biscamp understood that the Agreement and Waiver she executed "released [and/or]

_____

[2]     The parties use the terms "cage" and "kennel" interchangeably.

9

discharged [Pals] of responsibility or liability for dog bites and related injuries that [Biscamp] might sustain as a result of working as a community service worker."

Pals moved for judgment on its affirmative defense of release. After a hearing, the trial court granted the motion and rendered judgment that Biscamp take nothing on her negligence claim.

Biscamp moved to modify the trial court's judgment and for judgment notwithstanding the verdict, asserting that the evidence "establishe[d] that the releases were void as a matter of law"; "it was improper for the releases to be submitted to the jury"; "the questions [were] immaterial and should be disregarded"; and "there [was] no evidence to support [Pals's] affirmative defense of release." The trial court denied Biscamp's motion.

**Release**

In her sole issue, Biscamp asserts that the trial court erred in rendering a take-nothing judgment against her based on Pals's affirmative defense of release. She argues that the pre-injury releases in the Agreement and Waiver are unenforceable as a matter of law because they do not satisfy the express negligence doctrine, and the jury's findings that she understood them are immaterial.

A. *Standard of Review and Overarching Legal Principles*

A release is a "contractual arrangement whereby one party assumes the liability inherent in a situation, thereby relieving the other party of responsibility."

10

*Dresser Indus., Inc. v. Page Petroleum, Inc.*, 853 S.W.2d 505, 508 (Tex. 1993). "It operates to extinguish the claim or cause of action as effectively as would a prior judgment between the parties and is an absolute bar to any right of action on the released matter." *Id.* Release is an affirmative defense. TEX. R. CIV. P. 94. The interpretation of a release is a question of law to be decided by the trial court and reviewed de novo on appeal. *MCI Telecomm. Corp. v. Tex. Util. Elec. Co.*, 995 S.W.2d 647, 650–51 (Tex. 1999); *Mem'l Med. Ctr. of E. Tex. v. Keszler*, 943 S.W.2d 433, 434 (Tex. 1997).

"[R]eleasing a party in advance of liability for its own negligence" constitutes "an extraordinary shifting of risk." *Storage & Processors, Inc. v. Reyes*, 134 S.W.3d 190, 193 (Tex. 2004); *Grijalva v. Bally Total Fitness Corp.*, No. 01-14-00217-CV, 2015 WL 1544582, at *4 (Tex. App.—Houston [1st Dist.] Apr. 2, 2015, no. pet.) (mem. op.). A release of liability for future negligence is enforceable only if it comports with both prongs of the "fair notice requirements": (1) conspicuousness and (2) the express negligence doctrine. *See Reyes*, 134 S.W.3d at 192; *Grijalva*, 2015 WL 1544582, at *4. "Thus, fair notice is the chief test we must apply, and conspicuousness and express negligence are merely the two prongs of that test." *Sydlik v. REEIII, Inc.*, 195 S.W.3d 329, 332 (Tex. App.—Houston [14th Dist.] 2006, no pet.). Whether a provision complies with both fair notice requirements is a question of law for the court. *Dresser Indus.*, 853 S.W.2d at 509.

11

**B.** *Analysis*

Biscamp does not challenge whether the releases in the Agreement and Waiver satisfy the first prong of the fair notice requirements, that of conspicuousness.[3] She argues, rather, that the releases do not satisfy the second prong, the express negligence doctrine, because "[n]either release mentions or purports to release any claims based on Pals's negligence."

The purpose of the express negligence doctrine "is to require scriveners to make it clear when the intent of the parties is to exculpate [a releasee] for the [releasee's] own negligence." *Fisk Elec. Co. v. Constructors & Assocs., Inc.*, 888 S.W.2d 813, 815 (Tex. 1994) (quoting *Atl. Richfield Co. v. Petroleum Personnel, Inc.*, 768 S.W.2d 724, 726 (Tex. 1989)); *see also Ethyl Corp. v. Daniel Const. Co.*, 725 S.W.2d 705, 707–08 (Tex. 1987) ("[T]he scriveners of indemnity agreements have devised novel ways of writing provisions which fail to expressly state the true intent of those provisions. The intent of the scriveners is to indemnify the indemnitee for its negligence, yet be just ambiguous enough to conceal that intent from the

---

[3]  A provision is conspicuous if a reasonable person "ought to have noticed it." *Dresser Indus., Inc. v. Page Petroleum, Inc.*, 853 S.W.2d 505, 511 (Tex. 1993). "Language may satisfy the conspicuousness requirement by appearing in capital headings, contrasting type, font, or color, or an extremely short document, or by otherwise calling attention to itself." *Plasma Fab, LLC v. BankDirect Capital Fin., LLC*, 468 S.W.3d 121, 129 (Tex. App.—Austin 2015), *aff'd*, 519 S.W.3d 76 (Tex. 2017); *see Sydlik v. REEIII, Inc.*, 195 S.W.3d 329, 333 (Tex. App.—Houston [14th Dist.] 2006, no pet.) (release contained in one-page, three-paragraph document, identified as "release" in large, bold underlined statement at top was "conspicuous").

12

indemnitor. The result has been a plethora of lawsuits to construe those ambiguous contracts."). "Either the [release] agreement is clear and enforceable or it is not." *Fisk Elec. Co.*, 888 S.W.2d at 815. The determination does not depend on the outcome of the underlying suit; rather, it is established as a matter of law from the pleadings. *Id.*

The express negligence doctrine provides that "a party's intent to be released from all liability caused by its own future negligence must be expressed in unambiguous terms within the four corners of the contract." *Littlefield v. Schaefer*, 955 S.W.2d 272, 274 (Tex. 1997) (citing *Ethyl Corp.*, 725 S.W.2d at 707–08). The express negligence doctrine does not require that a release provision include the word "negligence." *See Lehmann v. Har-Con Corp.*, 76 S.W.3d 555, 562 n.3 (Tex. App.—Houston [14th Dist.] 2002, no pet.); *Banzhaf v. ADT Sec. Sys. Sw., Inc.*, 28 S.W.3d 180, 189 (Tex. App.—Eastland 2000, pet. denied). Rather, the test is whether the parties made it clear in the agreement that it was their intent to release claims of a party's own negligent acts. *See Lehmann*, 76 S.W.3d at 562 n.3; *Banzhaf*, 28 S.W.3d at 189; *see also Enserch Corp. v. Parker*, 794 S.W.2d 2, 8 (Tex. 1990). That is, there must be "some express language that would indicate an intention to waive claims of a party's own negligence." *Ramirez v. FFE Transp. Servs., Inc.*, No. 04-12-00342-CV, 2013 WL 1342453, at *2 (Tex. App.—San Antonio Apr. 3, 2013, pet. denied) (mem. op.).

The express negligence doctrine is not an affirmative defense but a rule of contract interpretation. *Fisk Elec. Co.*, 888 S.W.2d at 814. As such, we apply familiar contract principles. *Sydlik*, 195 S.W.3d at 333. We ascertain and give effect to the parties' intentions as expressed in the instrument. *Frost Nat'l Bank v. L&F Distribs., Ltd.*, 165 S.W.3d 310, 311–12 (Tex. 2005). We give terms their plain, ordinary, and generally accepted meaning. *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996). We consider the entire writing and attempt to harmonize and give effect to all the provisions by analyzing them with reference to the whole agreement, so that none will be rendered meaningless. *MCI Telecomms. Corp.*, 995 S.W.2d at 652; *Enserch Corp.*, 794 S.W.2d at 8 (holding "contract as a whole [was] sufficient to define the parties' intent that Christie indemnify Enserch for the consequences of Enserch's own negligence"). We presume that the parties intend every clause to have some effect. *Heritage Res., Inc.*, 939 S.W.2d at 121. "Specific and exact terms are given greater weight than general language." *Pratt-Shaw v. Pilgrim's Pride Corp.*, 122 S.W.3d 825, 829 (Tex. App.—Dallas 2003, pet. denied).

Here, the release in the Agreement states, in pertinent part:

*I understand that although [Pals] will make every attempt to ensure the safety of their volunteers and animals, rescue animals are by nature unpredictable in their behavior. Therefore, I assume the risks of being bitten,* scratched, *injured,* or frightened *by* cats, kittens, *dogs,* and puppies *in connection with my volunteer work for [Pals].* Neither [Pals] or any of its Directors, volunteers, fosters, or other affiliates are

14

liable to me for *any injuries, damages, liabilities, losses, judgments, costs,* damage to property *or expenses whatsoever that I might suffer or sustain in connection with the performance of my volunteer activities for [Pals].*

(Emphasis added.)

The release in the Waiver states, in pertinent part:

I agree that on behalf of myself, my heirs, personal representatives and executors, I release, discharge indemnify, and hold harmless [Pals], its agents, employees, directors and board of directors from *any and all claims, causes of action, or demands of any nature of cause*, including costs and attorney's fees incurred by [Pals] in connection with the same, *based on damages, or injuries which may be incurred or sustained by me in any way connected with my services for [Pals], including but not limited to animal bites*, accidents or injuries.

(Emphasis added).

Thus, the plain, ordinary language of the releases, read as a whole, reflects that, although Pals will endeavor to fulfill its duty to maintain a safe environment at the shelter, the behavior of dogs in rescue situations is by nature unpredictable, and Pals intended that it be released from all liability caused by its own failure to prevent dog bites that might be sustained by volunteers.

In support of its argument that the releases in this case are not specific enough to satisfy the express negligence doctrine, Biscamp argues that this case is like *Stanford v. Evans*, No. 14-08-00776-CV, 2010 WL 2517675 (Tex. App.—Houston [14th Dist.] June 24, 2010, no pet.) (mem. op.). There, the Stanfords leased a house from Evans. *Id.* at *1. After the house was destroyed by a fire caused by the

15

electrical system, the Stanfords sued Evans, alleging that he was negligent in maintaining the house. *Id.* The trial court rendered a take-nothing judgment against the Stanfords based on exculpatory provisions in the parties' lease, which stated:

> [LANDLORD IS] NOT RESPONSIBLE FOR DAMAGE OR LOSS OF [TENANTS'] PERSONAL PROPERTY STORED IN THE PREMISES. . . .
>
> . . . .
>
> **Indemnification**. [Landlord] shall not be liable for any damage . . . to any property, occurring in or near the premises, and [Tenants] agree to hold [Landlord] . . . harmless from any claims for damages no matter how caused.

*Id.* at *2. The court of appeals held that these provisions failed to satisfy the express negligence doctrine because they only "broadly assert" that "Evans will be held harmless from 'any claims' or 'any damage,' 'no matter how caused.'" *Id.* at *3. The court held that this broad language did not "specifically and unambiguously express the parties' intent to hold Evans blameless for his own negligent acts." *Id.*

Pals argues that the releases in this case are more like that in *Texas Engineering Extension Service v. Gifford*, No. 10-11-00242-CV, 2012 WL 851742 (Tex. App.—Waco Mar. 4, 2012, no pet.) (mem. op.). There, the plaintiff suffered injuries when he fell while participating in an industrial-fire-brigade training program, and he brought claims based in negligence against the defendant. *Id.* at *1. The defendant asserted that its liability was barred by a release that the plaintiff had signed during orientation, which provided:

16

1.     I hereby release, indemnify, and covenant not to sue[,] [defendant] . . . from *any and all liability, claims, costs and causes of action arising out of or related to any property damage or personal injury, including death, that may be sustained by me, while participating in such activity or while on the premises* . . . .

2.     *I am fully aware of the risks and hazards involved with Emergency Response Training, including but not limited to . . . falls*, and other related injuries, and I choose to voluntarily participate . . . .

*See id*. at 2–3 (emphasis added). The court of appeals noted that the "purpose of the express negligence rule is to require scriveners to make it clear when the intent of the parties is to exculpate a party for that party's own negligence." *Id.* at *3. And, "the express negligence doctrine does not require that the indemnity provision use the specific word 'negligence.'"[4] *Id.* The court held that the release satisfied the express negligence doctrine and effectively barred the plaintiff from recovering for injuries related to his fall. *Id.* at *4.

The conclusion in *Gifford* was examined in *Ramirez*, 2013 WL 1342453, at *4. In *Ramirez*, Ramirez's husband was employed as a truckdriver at FFE. *Id.* at *1. In order for Ramirez to travel with him, FFE required her to execute a release. *Id.* After Ramirez was injured while riding in the truck, she sued FFE for negligence. *Id.* FFE argued that Ramirez's claim was barred by the release she signed, which provided:

---

4     The express negligence doctrine applies to both indemnity agreements and releases. *Dresser Indus.*, 853 S.W.2d at 509.

17

> It is further agreed that Sponsoring Driver and Guest Passenger . . . hereby waive any and all claims, rights, and cause[s] of action which either or both of them may have in the future against [defendant]. . . and hereby release . . . [defendant] . . . from any claim[,] loss[,] or cause of action by Guest Passenger . . . arising out of any occurrence in connection with travel whenever occurring.

*Id.* at *1, 3. FFE argued that this language eliminated the concerns articulated in *Ethyl* because it did not attempt to conceal the claims for which FFE sought a release of liability. *Id.* Rather, the language clearly indicated FFE's intention to be released from any claim related to Ramirez's travel. *Id.* In support, FFE relied on *Gifford*.

The *Ramirez* court noted that the language in *Gifford* was "much more specific and provided notice of the exact type of claims for which [the defendant] sought exculpation." *Id.* at *4. "Indeed, Gifford was injured as the result of a hazard (falling) specifically listed in the second paragraph of the release." *Id.* The court concluded that "the more specific language used in the release agreement in *Gifford* [was] distinguishable from the general language" in the *Ramirez* release. *Id.*

In *Banzhaf*, the court held that an indemnity provision was sufficient to satisfy the express negligence doctrine. 28 S.W.3d at 188–89. There, after an employee was injured and another killed in a robbery at a sporting goods store, the injured employee and family of the deceased sued ADT, the security company that had provided security to the store, for various claims, including negligence. *Id.* at 183. ADT sought indemnity from the store based on a provision in their contract, which stated:

18

IN THE EVENT ANY PERSON, NOT A PARTY TO THIS AGREEMENT, SHALL MAKE A CLAIM OR FILE ANY LAWSUIT AGAINST ADT *FOR FAILURE OF ITS EQUIPMENT OR SERVICE IN ANY RESPECT*, CUSTOMER AGREES TO INDEMNIFY, DEFEND, AND HOLD ADT HARMLESS FROM ANY AND ALL SUCH CLAIMS AND LAWSUITS INCLUDING THE PAYMENT OF ALL DAMAGES, EXPENSES, COSTS, AND ATTORNEY'S FEES.

*Id.* at 189 (emphasis added). The court noted that the express negligence doctrine did not require that the indemnity provision use the specific word "negligence." *Id.* The court held that the "language, 'for failure of its equipment or service in any respect,' covered claims against ADT for negligence" and was sufficient to satisfy the express negligence doctrine. *Id.* (noting that ADT "made no attempt to conceal its purpose to be indemnified" (citing *Ethyl*, 725 S.W.3d at 707–08)).

Here, we conclude that the language in the releases in the instant case is similar to that in *Gifford* and in *Banzhaf* because it is "specific and provided notice of the exact type of claims for which [Pals] sought exculpation." *See Ramirez*, 2013 WL 1342453, at *4 (discussing *Gifford*); *see also Banzhaf*, 28 S.W.3d at 188–89. Again, the express negligence doctrine does not require that a release include the word "negligence." *Stanford*, 2010 WL 2517675, at *3; *Lehmann*, 76 S.W.3d at 562 n.3; *Banzhaf*, 28 S.W.3d at 189. Rather, there must be "some express language that would indicate an intention to waive claims of a party's own negligence." *Ramirez*, 2013 WL 1342453, at *2.

19

The releases, read as a whole, expressly and unambiguously state Pals's intent to be released from all liability caused by its own failure to ensure a safe environment for volunteers with respect to the risk of injuries from dog bites that might occur. *See id.*; *see Littlefield*, 955 S.W.2d at 274; *cf. Stanford*, 2010 WL 2517675, at *3. The release language sufficiently defines the parties' intent and affords fair notice that Pals intends to be released from claims of its own negligence. *See Enserch Corp.*, 794 S.W.2d at 8–9; *Banzhaf*, 28 S.W.3d at 188–89. We hold that the releases are sufficient to satisfy the requirements of the express negligence doctrine.

Accordingly, we hold that the trial court did not err in rendering judgment in favor of Pals on its affirmative defense.

We overrule Biscamp's sole issue.[5]

### Conclusion

We affirm the trial court's judgment.


Sherry Radack
Chief Justice

Panel consists of Chief Justice Radack and Justices Landau and Hightower.

---

[5] We do not reach Biscamp's second sub-issue, in which she asserts that the jury's answers to Questions 3, 4, and 5 of the charge (finding that Biscamp understood the releases) are immaterial with respect to the express negligence issue. Whether the express negligence doctrine is satisfied is a question of law for the trial court. *Dresser Indus.*, 853 S.W.2d at 509. Thus, the jury's findings are superfluous and not necessary to our disposition of the appeal. *See* TEX. R. APP. P. 47.1.